# WEINBERG REALTY CO., INC. *v.* THE HARFORD MUTUAL INSURANCE COMPANY

[No. 1147, September Term, 1979.]

*Decided May 9, 1980.*

The cause was argued before GILBERT, C. J., and MELVIN and WILNER, JJ.

*Peter Parker,* with whom were *White, Page & Lentz* on the brief, for appellant.

*V. Timothy Bambrick,* with whom were *George M. Radcliffe* and *Niles, Barton & Wilmer* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

Appellant seeks to recover under a fire insurance policy for fire damage done to one of its rental properties on Christmas Day, 1976. The case involves the interplay between two "conditions" stated in the policy.

The basic facts are not in dispute. The property, a rowhouse in Baltimore City, had been owned by appellant since 1962 and, except for a one-month period in March, 1974, had been continuously occupied by tenants. During the 1974 vacancy, there were two fires in the property — one on March 20, 1974, the other ten days later; but neither caused substantial damage. In both cases, the City Fire Investigation Bureau concluded that the fire was caused by mischievous children who had managed to get into the house. With respect to the March 20 fire, the Bureau's report stated: "Investigation disclosed that building was in a condition open to trespassers" and that the fire erupted from the burning of trash in the first floor rear. The second fire also started from the burning of trash, in the second floor front.

On November 15, 1976, appellant evicted the then-current tenant for nonpayment of rent. At that time, the property was in a deteriorated condition and had 54 outstanding housing violations charged against it, including, among many other things, broken windows and doors.

The violation notice was issued by the City on November 4, 1976. Appellant's president, Raymond Weinberg, said that he did not receive the notice until after November 15, but that at some point toward the end of November, he went to the house "to make sure it was locked up and it was clean." When leaving the house, he locked the front door but did not check the rear basement door except to drive around the back and see from his car that it was closed. He said that the building was clean — "[i]t was cleaned of everything. Nothing was there."

Appellant had a repairman — one Edward Cooley — who, for 12 years, had done its repair work. Mr. Weinberg said that he intended to have Mr. Cooley fix the place, correct the violations, after "the first part of the year." Aside from see-

562

ing that the front door was locked (and believing that the back door also was locked), nothing was done to secure the property during the expected vacancy period — *i.e.,* until Mr. Cooley would commence the repairs. The property was not boarded up, nor was it regularly inspected. Mr. Weinberg did not return to the property after his November visit and did not ask Cooley or anyone else to secure or watch it.

The fire that triggered this lawsuit — on December 25, 1976 — was a substantial one. The Fire Investigation Bureau concluded that it was probably the result of "malicious burning by vagrants." The Bureau's report states, in part:

> "Fire apparently originated in 1st floor, front room and was probably initiated by vagrants using house for shelter who had built a fire for heat. Building has had two (2) previous fires, no repairs made, and lies open to public and elements." [1]

At the time of the Christmas fire, the property was insured by appellee on behalf of the Maryland Joint Insurance Association (*see* Md. Ann. Code art. 48A, § 478C), under what is referred to as the "standard 165-line New York fire insurance contract," to which were appended four endorsements. The face amount of the coverage was shown as $14,000 (having been raised from $10,000 in May, 1973). In the opening clause of the policy, appellee agreed to insure the property against direct loss by fire (and other perils) "to an amount not exceeding the amount(s) above specified [i.e., $14,000] ... to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality...."

On page two, in lines 28-37, the policy set forth certain

---

1. This report was apparently based on an inspection occurring on December 29, 1976 — four days after the fire. It is not clear whether the condition noted — "lies open to public and elements" — refers to the condition after the fire or when the firemen first arrived to put the fire out.

"conditions suspending or restricting insurance." These were stated as follows:

"Unless otherwise provided in writing added hereto this Company shall not be liable for loss occurring

(a) while the hazard is increased by any means within the control or knowledge of the insured; or

(b) while a described building, whether intended for occupancy by owner or tenant, is vacant or unoccupied beyond a period of sixty consecutive days; or

(c) as a result of explosion or riot, unless fire ensues, and in that event for loss by fire only."

One of the endorsements attached to the policy was denoted as Form 801I, entitled "DWELLING BUILDING(S) AND CONTENTS FORM." It stated, in relevant part, "THE FOLLOWING CONDITIONS OF VACANCY OR UNOCCUPANCY APPLY IN ACCORDANCE WITH PROTECTION CLASSIFICATION SHOWN ON THE FIRST PAGE OF THIS POLICY

PROTECTED RISKS — Permission granted to be vacant or unoccupied without limit of time."

A second endorsement relied upon by appellant was that applicable to vandalism and malicious mischief (Form No. 255I). Subject to the conditions in the endorsement, it extended the basic policy coverage to "direct loss by Vandalism and Malicious Mischief" and, as to that coverage only, stated, in part:

"This company shall not be liable for loss if the described building(s) had been vacant or unoccupied beyond a period of thirty (30) consecutive days immediately preceding the loss, whether or not such period commenced prior to the inception date of this endorsement. . . ."

In due course, after the fire, appellant made a claim for

payment of the entire $14,000 face coverage, contending that both the cost of repairs ($36,747) and the actual cash value of the property ($23,246) exceeded that amount. When appellee rejected the claim, appellant sued on the policy in the Circuit Court for Harford County, and, being unsuccessful there, appeals. Two issues are presented: (1) whether the court erred in accepting appellee's "coverage" defense, and (2) if so, whether its analysis of the amount that would be due under the policy was correct. Because we do not believe that the court erred in its handling of the first issue, it becomes unnecessary for us to address the second.

Appellee rejected appellant's claim, and defends this lawsuit, upon the assertion that, by permitting the property, in its deteriorated condition, to remain unsecured during the 40-day period of vacancy (from November 15 — December 25), given the history of what occurred during the March, 1974, vacancy, appellant has caused or suffered the hazard to the property to be increased by a means within its control or knowledge. It is thus relying on condition (a), appearing on lines 28-32 of the policy.

Appellant contends, in response, that, as a matter of law, a defense based on vacancy must be governed by condition (b) — lines 33-35 — as supplemented by the language or "permission" in the Form 801I endorsement; *i.e.,* that under the basic policy, coverage is not suspended or restricted until the 61st day of vacancy, and under the endorsement, would not be suspended however long the property remained vacant. The initial question, then, is whether a vacancy which would not otherwise trigger a suspension or restriction of coverage may, when coupled with a failure to secure the property against intruders during that period of vacancy, nevertheless have that effect as constituting an increase in hazard to the property.

In a few early cases, involving rural or isolated properties, some courts more or less assumed that a prolonged vacancy alone might have that effect. *See,* for example, *Lancy v. Home Ins. Co.,* 20 Atl. 79 (Me. 1890); *Frozine v. St. Paul Fire & Marine Ins. Co.,* 218 N.W. 845, 847 (Wis. 1928): "It is a matter of common knowledge that a building so vacated is

subject to increased hazards of fire";[2] *Home Ins. Co. v. Hardin,* 139 So. 603 (Miss. 1932): "It is a matter of common knowledge that the hazard of fire is much greater when dwelling houses are vacant and unoccupied, especially when situated in the country. . . ." The Wisconsin and Mississippi cases, it should be noted, involved a clause suspending coverage because of a vacancy beyond a specified period, not a clause dealing directly with an increase in hazard. The courts' comments in those cases were in the context of sustaining the validity of the "vacancy" clause.

Later cases have refrained from such "common knowledge" approaches, and have looked instead to the particular fact situation underlying the controversy. In *Knoff v. United States Fidelity and Guaranty Co.,* 447 S.W.2d 497 (Tex. Civ. App. 1969), for example, the Court concluded that it was error for the trial court to assume such a nexus as a matter of law, observing, at p. 502:

> "A dwelling may be unoccupied in the sense that no one is living there continuously, yet such attention in the protection of the property may be given by the owner as to prevent there being an increase in hazard. The total of all facts must be considered. Whether there has been an increase in hazard or not must be determined by a comparison with the conditions existing at the time the policy was written. The mere fact of a dwelling being unoccupied does not establish an increase in risk as a matter of law."

*Knoff* involved essentially the same policy conditions applicable here. At the time of the fire, the house was not continuously occupied, but there was some furniture in it and family members would check on it from time to time. One person even slept there occasionally. Evidence showed that it had been boarded up, but was occasionally broken

---

**2.** *Frozine* involved a hotel that was vacated, but left furnished, 18 days before the fire. Evidence showed that one or two persons occupied rooms in the hotel during this period, at least one of whom did so without the owner's permission.

into and reboarded. From this, the appellate court concluded that summary judgment for the insurer based on increased hazard was inappropriate. The case was remanded for trial.

In *Asbell v. Pearl Assurance Co.,* 157 A.2d 728 (N.J. Super. 1960), the Court affirmed the denial of recovery on the basis of increased hazard where the evidence showed that, following an earlier fire, the building in question had been left in an open and dilapidated condition. At p. 730:

"The defendant [insurer] relied upon something more than mere vacancy or unoccupancy, as such, in defending on the basis of the increase of hazard clause. Leaving a structure open to the incursions of vagrants ... and failing to clean up combustible debris remaining after a prior fire with reasonable dispatch, after actual or constructive knowledge of such conditions, constitute an increase of the fire hazard, separate and apart from such increase of hazard as may inhere in a 60-day vacancy *per se.* Cancellation of the stipulation as to the latter contingency did not abate the operation of the increase of hazard clause as to circumstances actually augmenting the hazard and distinct from the fact of vacancy in itself."

In *Montello v. Manhattan Fire & Marine Ins. Co.,* 294 N.Y.S. 1015 (1937), the insurer had pled, in defense to an action on the policy, not only "that the building was found to be unsafe and in a hazardous condition, but that prior to the fire all of the occupants of the building moved out, leaving it unoccupied and unguarded, in which state it 'was stripped and large parts thereof were removed'; that all of these facts were known to the plaintiff and materially increased the fire hazard." This pleading, said the court at p. 1017, raised an issue of fact "which, if resolved in favor of the defendant insurance company, would absolve it from liability under its policy."

*Montello* was cited in the more recent case of *Frost House, Inc. v. Preferred Mutual Insurance Co.,* 223 N.Y.S.2d 875

(1962), where, without discussing the facts before it, the court tersely noted:

"Whether the hazard was increased by means within the control of the insured is an issue of fact. . . . The extension of coverage to the property when vacant or unoccupied without limit of time did not entitle the insured to otherwise increase the fire hazard by abandonment and disrepair. Whether the abandonment or disrepair here was sufficiently extensive or protracted in time to constitute an increased hazard within the terms of the policy, giving effect to the vacancy clause, is an issue of fact. . . ."

In *Paterson-Leitch Co. v. Insurance Co. of No. America,* 366 F. Supp. 749 (N.D. Ohio 1973), the Court picked up the holding in *Frost House.* The insured property consisted of three adjoining dwellings damaged by fire on February 28, 1972. A week or two earlier, the owner had contracted to have the buildings demolished, and, by the time of the fire, most of the necessary permits for the demolition had been obtained. All utilities had been disconnected, and at various times within the month before the fire, all of the tenants had moved. No watchman or other security personnel had been employed to guard the buildings against entry by vagrants. The Court stated, at p. 755:

"[I]t would seem that, in the circumstances of this case, defendant may not rely on vacancy or unoccupancy, as such, in defending on the basis of the increase of hazard clause. It must be shown that plaintiff *otherwise* increased the fire hazard prior to the fire either by having substantially abandoned the dwellings so as to allow easy access to vagrants, or by having allowed the dwellings to fall into a state of extensive and dangerous disrepair." (Emphasis supplied.)

On the facts before it, the court denied the pending motion for summary judgment, being unable to determine, as a

matter of law, whether or not the dwellings were "so abandoned as to be left open to vagrants and undesirables."

*Compare also Birmingham Fire Insurance Co. of Pa. v. McKnight,* 151 So. 2d 409 (Miss. 1963), where the increased hazard defense was rejected upon evidence that, although the property was vacant, it was watched over by a neighbor, and *Balen Developing Corporation v. American Home Assurance Company,* 1975 Fire and Casualty 825 (N.Y. Supp. Ct. 1975), wherein the court found as fact that the insured properties were unguarded, open to the elements and unauthorized persons, unsafe, a serious fire hazard, periodically vandalized, in a serious state of disrepair, and abandoned, and concluded that "[a]n abandoned condition of a building constitutes an increase in hazard, which will bar recovery." *See,* in general, 8 *Couch on Insurance* 2d § 37:716.

Two main principles emerge from these cases: (1) although a period of vacancy or unoccupancy will not suffice *per se* to invoke a suspension of coverage upon the premise of an increased hazard within the insured's control, such vacancy, when coupled with other risk-enhancing factors, may have that effect; and (2) except possibly in the most extreme cases on either end of the spectrum, this is a judgment that requires a careful weighing of all the relevant facts in the light of simple common sense. The duty to secure the property, physically and/or by human observation, obviously increases in proportion to the duration of the vacancy, the inherent hazard to the property from debris or other flammable conditions, and the susceptibility of the property to unauthorized intrusions — its openness to vagrants and vandals.

This is not an extreme case in which a judgment can be made as a matter of law; nor did the trial court resolve it in that manner. It considered the 40-day duration of the vacancy, the steps taken (and not taken) to secure or watch over the property, the history of what occurred during the earlier period of vacancy, the physical condition of the property evidenced in part by the 54 housing violations, the apparent ability of vagrants to enter the place

notwithstanding that the front (and possibly the back) door was locked, and the origin and cause of the fire that triggered this claim. Balancing these things, the court concluded that the increased hazard condition was applicable, that leaving the property in that condition for that period of time without a more significant effort to secure and protect it did indeed increase the hazard substantially by a means within appellant's control.

In reviewing that judgment, we are constrained by Maryland Rule 1086 not to set it aside on the evidence "unless clearly erroneous." It is not our function, in that regard, to determine whether, on the same evidence, we might (or would) have reached a different conclusion, but only whether there is in the record legally sufficient evidence to support the trial court's conclusion. We think that there was, and thus shall affirm.

*Judgment affirmed; appellant to pay the costs.*